# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

J.S., a minor by his parents, M.S.          :
and D.S.                                     :
                                             :
            v.                               :      No. 341 C.D. 2019
                                             :      Argued:  December 12, 2019
Manheim Township School District,           :
                Appellant                    :

BEFORE:    HONORABLE MARY HANNAH LEAVITT, President Judge
           HONORABLE P. KEVIN BROBSON, Judge
           HONORABLE ANNE E. COVEY, Judge

OPINION
BY PRESIDENT JUDGE LEAVITT                           FILED: May 13, 2020

       The Manheim Township School District (School District) appeals an order of the Court of Common Pleas of Lancaster County (trial court), which reversed the decision of the School District's Board of School Directors (School Board) to expel J.S., a student at Manheim Township High School.  The trial court held that the factual findings of the School Board were not supported by substantial evidence; that the School District's evidence did not establish that J.S. made terroristic threats or engaged in cyberbullying of another student, in violation of School District policy; and that J.S. was denied due process.  The School District contends that the trial court erred and abused its discretion in reaching these conclusions.  Upon review, we affirm the trial court.

       The School District expelled J.S. for two "Snapchat memes" he sent to another student (Student One) as part of an extended conversation over a period of 10 days, during which J.S. and Student One made fun of a classmate (Student Two). J.S. and Student One joked that Student Two looked like a school shooter because of his long hair and preference for wearing a "Cannibal Corpse" tee shirt.  Cannibal

Corpse is a hard metal rock group that uses violent lyrics and graphic imagery drawn from horror fiction and films.[1] This extended conversation about Student Two took place after school, with each participant using a private cell phone in his respective home.

Snapchat is a social media application for smartphones that allows users to send private text messages, photographs and video messages to other users. *Goldman v. Breitbart News Network, LLC,* 302 F. Supp. 3d 585, 586 n.1 (S.D.N.Y. 2018). A communication sent by Snapchat is called a "snap." These messages are limited in duration, cannot be accessed from the web, and can only be viewed temporarily.[2] As of April 10, 2018, the Snapchat conversation between J.S. and Student One entailed approximately 20 messages and 5 images. Two of the images were "memes." A meme is a photo or video image with caption superimposed on the image "by the one sending the meme." Trial Court Op., 2/25/2019, at 2, n.3. Memes are often used for humor and political commentary. The two memes about Student Two, which J.S. sent to Student One, caused the School District to expel J.S.

The first meme is a still photograph of Student Two singing into a microphone and is captioned as follows: "I'm shooting up the school this week. I can't take it anymore I'm DONE!" Reproduced Record at 37a-38a (R.R. __). At the bottom of the meme is a photo-shopped image of J.S. wearing large "Elton John" glasses, apparently watching Student Two's performance. The response of Student One to this meme was "LOL," which means "laughing out loud." School Board Hearing Notes of Testimony, 5/3/2018, at 97-98 (N.T. __); R.R. 148a-49a.

---

[1] *See* https://en.wikipedia.org/wiki/Cannibal_Corpse (last visited May 12, 2020).

[2] As the trial court observed, "[t]he only way to save a message is to take affirmative steps to do so or take a screen shot[.]" Trial Court Op., 2/25/2019, at 34.

Apparently pleased by Student One's response to this meme, J.S. then created a short video meme. It depicted Student Two playing guitar music into a microphone and was captioned as follows: "IM READY [Student One] AND MANY MORE WILL PERISH IN THIS STORM. I WILL TRY TO TAKE [Student One] ALIVE AND TIE HIM UP AND EAT HIM." R.R. 39a. The quote was attributed to Student Two, who was singing lyrics by Cannibal Corpse. The lyrics of this band employ gory imagery and include references to "eating boys" and "drinking their blood." N.T. 97; R.R. 148a.

Student One then posted the "I can't take it anymore" meme to his personal Snapchat "story," where it could be viewed by Student One's Snapchat "friends." It was available for approximately five minutes and seen by 20 to 40 other students. One student reported the meme to his parent, who reported the meme to the High School Principal. In turn, the Principal contacted the School District Superintendent and the police.

Student One had not shared any of the other messages between him and J.S. over the prior 10 days. When J.S. learned what Student One had done, he asked Student One to remove the meme from his Snapchat story. Student One did so, stating it was a "[p]robable false alarm, just something [J.S.] sent me." R.R. 40a.

In the early morning of April 11, 2018, the police arrived at the home of J.S. and interviewed both J.S. and his parents about the meme Student One had posted on his Snapchat story. The police concluded that J.S. had not made a threat and that there was no threat to school safety and so reported to the School District. Nevertheless, the High School sent an e-mail to all parents stating that there had been a threat. The press then reported that a High School student had been

3

suspended for posting a threat on social media. However, it was not J.S., but, rather, Student One who had posted the meme and made it public.

The High School administration continued to interview J.S., who explained that he intended his on-line conversation with Student One to be funny and to remain private. On April 12, 2018, the School District suspended J.S. for three days for making a terroristic threat and for causing serious inconvenience to the school. When the High School later obtained the video meme, it suspended J.S. for seven more days.

On April 12, 2018, the School District formally charged J.S. with violating the School District's policy against terroristic threats (Board Policy No. 218.2). The policy defines "terroristic threat" as "a threat to commit violence communicated *with the intent* to terrorize another…." R.R. 3a (emphasis added). On April 16, 2018, the School District formally charged J.S. with violating its policy against cyberbullying (Board Policy No. 249). That policy states that the School District will provide "a safe, positive learning environment for district students and that in this environment bullying and harassment in any form is not tolerated." Certified Administrative Record of School District, No. 6 at 000017.[3] The policy defines "bullying" as an "intentional electronic, written, verbal or physical act or series of acts directed at another student" that "occurs in a school setting." *Id*. It defines the "school setting" as school grounds, school vehicles, designated bus stops, and school sponsored activities "regardless of location" or "use of school-owned communication device, networks or equipment." *Id*. No charges were brought against Student One, who posted the meme.

---

[3] The School District inadvertently included a more recent version of Board Policy No. 249 in its reproduced record and attached the correct version to its reply brief. *See* School District Reply Brief at 1 n.1.

4

On May 3, 2018, a hearing on the charges was held before three members of the School Board. Prior to the hearing, J.S.'s parents attempted to obtain the presence of Student One, but the School District declined to compel his attendance, asserting that it lacked subpoena power. At the hearing, the School District introduced testimony, over J.S.'s hearsay objection, that Student One told High School administrators that he had felt terrorized by the two memes and had publicized the "I can't take it anymore" meme to alert others to a possible threat.

On May 11, 2018, the School Board issued an adjudication accepting the High School's recommendation that J.S. be expelled for "making terroristic threats and engaging in cyber-bullying against another through social media." School Board Adjudication at 2 and 5, Findings of Fact Nos. 9 and 34; R.R. 3a, 6a.

J.S. appealed to the trial court, contending that the School Board's conclusions were unfounded. He argued that its factual findings were not supported by substantial evidence, *inter alia*, because they were based on hearsay to which J.S. had objected. He also argued that he had been denied due process because he was unable to confront the witness, Student One, identified in the School District's formal charges as the intended victim of terroristic threats and cyberbullying. The trial court sustained J.S.'s appeal.

First, the trial court held that J.S.'s hearing did not comport with due process because Student One did not appear at J.S.'s expulsion hearing. The trial court explained that students facing expulsion are entitled to a formal hearing, which includes the right to cross-examine witnesses. Because the School District identified Student One as the person J.S. threatened and bullied, the trial court held that testimony from Student One was necessary in order for the School District to make its case against J.S.

5

The trial court next held that J.S. did not violate the School District's terroristic threats policy. The School District offered no evidence that J.S. intended the meme to terrorize Student One or to have the meme be seen by the public. Intent is central to the definition of "terroristic threat" in Board Policy No. 218.2.

Finally, the trial court held that the School District did not prove a violation of the anti-bullying policy, which applies to the school setting. There was no evidence that J.S. created either of the two offending memes in a school, on school grounds, in a school vehicle, at a bus stop, at a school sponsored activity or by using school equipment. Trial Court Op., 2/25/2019, at 38. J.S.'s memes were created and sent from his private cell phone to Student One's private cell phone and after school hours.

On appeal,[4] the School District raises four issues. First, it contends that the trial court erred in holding that J.S. had a due process right to confront Student One, the person identified by the School District as the target of J.S.'s alleged terroristic threats and cyberbullying. Second, it contends that the trial court abused its discretion because the trial court did not defer to the School District's interpretation of its policies against terroristic threats and cyberbullying. Third, it contends that the trial court erred in its analysis of the First Amendment.[5] Fourth, it contends that the trial court abused its discretion in its application of the substantial evidence standard to the School Board's findings of fact.[6]

---

[4] "This Court's scope of review determines whether the trial court abused its discretion, committed an error of law, or violated constitutional rights." *Yatron by Yatron v. Hamburg Area School District*, 631 A.2d 758, 760 n.1 (Pa. Cmwlth. 1993).

[5] U.S. CONST. amend. I.

[6] In its fourth issue, the School District argues that the trial court failed to defer to the School Board's findings of fact and conducted what amounted to a *de novo* review. School District Brief at 37. The School District complains that the trial court focused on Student One as the alleged target of the terroristic threats and ignored the School Board's finding that J.S. referred to the High

Having reviewed the record, the arguments of the parties, and the relevant law, we conclude that the School District's issues have been ably resolved in the thorough and well-reasoned opinion of the Honorable Leonard G. Brown, III. Therefore, this Court affirms on the basis of the trial court's opinion in *J.S., a minor, by his parents, M.S. and J.S. v. Manheim Township School District* (C.C.P. Lancaster Cty., No. CI-18-04246, filed February 25, 2019).

_____

Mary Hannah Leavitt, President Judge

---

School as the target of the shooting and "identified a High School student by name as the specific target of the threat." School District Brief at 42. However, the School District charged J.S. with sending "several threatening social media messages to another [High School] student on April 10, 2018." R.R. 24a. It did not charge J.S. with making threats against the High School or any individual other than Student One. The School District's argument lacks merit.

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

J.S., a minor by his parents, M.S. and D.S.

v.                                    :    No. 341 C.D. 2019

Manheim Township School District,    :
                        Appellant     :

# **O R D E R**

AND NOW, this 13th day of May, 2020, the order of the Court of Common Pleas of Lancaster County (trial court) dated February 25, 2019, is AFFIRMED on the basis of the trial court's opinion in *J.S., a minor, by his parents, M.S. and J.S. v. Manheim Township School District* (C.C.P. Lancaster Cty., No. CI-18-04246, filed February 25, 2019).

_____
Mary Hannah Leavitt, President Judge

ENTERED AND FILED
PROTHONOTARY'S OFFICE
LANCASTER, PA
***Electronically Filed*****
Feb 25 2019 08:06AM
Audrey Conrad

IN THE COURT OF COMMON PLEAS OF LANCASTER COUNTY, PENNSYLVANIA
CIVIL ACTION – LAW

J.S., a minor, by his parents,     :
M.S, and J.S.,             :
      Appellant,       :
                      :
      v.                 :    No. CI-18-04246
                      :
MANHEIM TOWNSHIP SCHOOL  :
DISTRICT,              :
      Appellee.        :

## OPINION

J.S. has appealed his May 11, 2018, expulsion from Manheim Township High School.

The parties have thoroughly briefed[1] and argued their respective positions. This matter is ripe

for review.

## I.    FACTS

Public schools exist in challenging times. Administrators and teachers have the

monumental task of educating students to be virtuous public citizens and successful members of

an ever-more-global community. The core task itself is challenging but added to it are many

responsibilities to protect students from emotional and physical harm in an age of lightning-fast

communication and ubiquitous violence. Violence has become a part of students' daily life:

from the video games they play, to the music they listen to, to the school violence they read

about. Nothing in this opinion is meant to diminish the daunting challenges faced by schools in

today's world. The facts at issue here, though, test the boundaries of how far a school may go in

---

[1] After oral argument the court allowed the parties to submit briefs of no more than ten (10) pages regarding issues discussed at argument. Plaintiff complied with the court's direction and submitted a ten (10) page brief. Defendant submitted a fourteen (14) page brief.

1

its responsibilities to protect some students and punish others consistent with the Due Process Clause of and First Amendment to the United States Constitution.

On June 22, 2018, in response to recent school shootings, the Pennsylvania House of Representatives and the Pennsylvania Senate signed Act 44, which Governor Wolfe approved on the same day. Act 44 established, among other things, the Safe2Say program to "supplement, not replace, 911 services." 24 P.S. § 13-1301-D(4). The legislature explained that the intent of the Safe2Say program is to "be a one-stop shop for students, teachers and community members to report behavior perceived to be threatening to an individual or a school entity." Id. § 13-1301-D(3). Further, the intent of Act 44 is not that it be used as a disciplinary tool for school employees, though information from the Program may be shared with them. See id. § 13-1301-D(5).

The circumstances leading to this appeal took place less than three months before enactment of Act 44. There are three students involved in communications for which Manheim Township School District ("School District") punished J.S.: (1) J.S.; (2) Student 1; and (3) Student 2. The School District claims it punished J.S. only for communications he sent to Student 1 and for nothing else.

Using Snapchat, J.S. sent snaps[2] including a number of memes[3] to Student 1 making fun of Student 2. These memes were premised on J.S.'s opinion that Student 2 "looked like" a school shooter. RR 138–39. Whether J.S. directed his ridicule at Student 2 based on the student's choice of clothing or another characteristic is not clear, but unbeknownst to Student 2,

---

[2] The court will refer to communication sent via Snapchat as a "snap."

[3] A meme has not been defined by any Pennsylvania courts but is commonly understood as a picture with a caption often created by the one sending the meme. Appellants contend memes are humorous, but the court is unwilling to accept their subjective interpretation of all memes.

2

he became an unwilling star of belittling Snapchat activity between J.S. and Student 1 over a period of approximately ten days and at least twenty snaps. RR 75. Student 1 never reported any concern to his parents, police, or school administrators about any of the content of J.S.'s snaps or memes. There is also no evidence or finding that any of the snaps were sent during school hours, during school activities, with the use of any school equipment, or on school property. Dean of Students, Matt Johns learned from J.S. that he and Student 1 had engaged "in a thread of Direct Messages via Snapchat in which he and [Student 1] referred to [Student 2] as a school shooter. [J.S.] stated he did not know who raised the topic." RR 196.

There are two memes at issue in this appeal. The first meme J.S. sent to Student 1 consisted of Student 2's picture and a caption he attributed to Student 2 stating, "I'm shooting up the school this week I can't take it anymore I'm DONE!" RR 195. Nothing in the communication identified that "the school" was Manheim Township High School, though that fact may be inferred given that all three students attended Manheim Township High School. Following the caption of the meme are three emojis, two depicting blue sinister smiling faces and one emoji of a gun. Student 1 responded "LOL." RR 145. The second meme is a video of Student 2 singing with the caption, "I'll be ready, [Student 1]. Many more will perish in this storm. I will try to take [Student 1] alive and tie him up and eat him." RR 63. Again, nothing indicated that the statement referred to Manheim Township High School. Student 2 continued to be unaware that his image was being used in the memes, RR 79, and Student 1 never reported any concern he had about the memes.

Instead, on the evening of April 10, 2018, Student 1 posted the meme with the statement "I'm shooting up the school this week I can't take it anymore I'm DONE!" to his Snapchat

3

story.[4] Student 1 did not express concern to anyone that the meme was a threat to him or other students. Dean of Students, Matt Johns found that Student 1 had direct messaged J.S. via Snapchat telling J.S. that he (Student 1) posted the image. J.S. responded to Student 1 that he should take the image down. RR 197. Student 1 removed the post after approximately five (5) minutes with a statement, "Probable false alarm. Just something J.S. sent me." The damage of Student 1's post had been done though.

That same evening, another student whose father, William Sassman, is employed by the Manheim Township School District, received a text of a screen shot of Student 1's Snapchat story post from a classmate. Mr. Sassman's son did not receive the text from Student 1 and did not take the screen shot directly from Student 1's Snapchat story. RR 65. In all, the School District believes twenty to forty students saw the Snapchat story post by Student 1. The School District does not assert that any of the other students are victims of terroristic threats.

Mr. Sassman's son woke him up between 9:30 and 10:00 p.m. to show him the screen shot. The screen shot was of the meme containing the words, "I'm shooting up the school this week I can't take it anymore I'm DONE!" RR 66. Mr. Sassman did not call the police or a school administrator. Mr. Sassman did not call 911. He merely texted the high school principal, David Rilatt, around 10:50 p.m. The record does not contain the content of any texts between Mr. Sassman and Mr. Rilatt, but Mr. Sassman testified he contacted Mr. Rilatt because he was concerned with the message expressed in the screenshot and the person depicted in the image. RR 66, 70, 110.

---

[4] A Snapchat story is a series of snaps posted in a sequence that are public for a longer period of time than a Snapchat message prior to disappearing. RR 45. According to Snapchat, a Snapchat story "is a select collection of your Snaps that play in the order you took them. My Story lasts 24 hours, so your friends can see your day unfold." https://support.snapchat.com/en-US/a/my-story.

4

Mr. Rilatt and Mr. Sassman exchanged texts and then Mr. Rilatt called Assistant Superintendent, Dale Reimann after which Mr. Rilatt called the Manheim Township Police. Mr. Rilatt's call to the police was at 11:04 p.m. RR 110. Manheim Township police investigated the situation and at 2:00 a.m. on April 11, 2018, told Mr. Rilatt that there was no need to cancel school that day. RR 111. Thereafter, the superintendent sent an email to parents and teachers explaining that there was a threat posted on social media but that after an investigation, the school and campus were safe. RR 224. Somehow, the incident also made its way into media reports also published on April 11, 2018. RR 221–23.

The superintendent's email communication resulting from Student 1's post, and the media coverage created concern and discussion between teachers and students at the school on April 11, 2018. RR 77. Dean of Students, Matt Johns described the conversation as a "buzz" in the school because "people were not overly sure who the source of the post was and if it was a real threat." Id.

## II. PROCEDURAL HISTORY

On April 11 and 12, 2018, school administrators interviewed J.S. and his parents. On April 12, 2018, the administration notified J.S. and his parents of J.S.'s suspension from school for April 12, 13, and 16, 2018, pending further investigation by the school. The written notice listed "violation of Policy 218.2: Terroristic Threats/Acts" as the reason for the suspension. RR 24. On April 16, 2018, the administration amended the notice to include "violation of Policy 249: Bullying/Cyberbullying" and extended J.S.'s suspension through April 25, 2018.

An undated statement of charges against J.S. charges J.S. with violating both of the above policies when he sent the memes he created of Student 2 to Student 1 via Snapchat. RR 210.

5

The administration notified J.S. and his parents by two letters,[5] one dated April 17, 2018, and one dated April 20, 2018, of a formal hearing to occur on April 25, 2018, for the purpose of considering expelling J.S. for violating two school policies: one on making terroristic threats, Policy 218.2, and one on bullying, Policy 249. The April 17, 2018, letter contains a waiver of right to formal hearing and a paragraph explaining that J.S. may waive his right to a formal hearing and "respond to these charges at today's informal hearing." RR 225. The formal hearing occurred on May 3, 2018, before a committee of the Manheim Township School Board at which time J.S. was represented by counsel.

The committee found that J.S. privately sent three Snapchat images to Student 1 and used the "posts"[6] to make it appear Student 2 was threatening a school shooting, but that Student 2 was unaware his image was being used by J.S. RR 42. The committee also found that J.S. posted three Snapchat images and "[t]he High School administration ultimately decided to suspend [J.S.] from school for ten (10) days for all three of the Snapchat postings and recommended [J.S.'s] expulsion from school." RR 44 (emphasis added). The committee further found that the "Snapchat postings . . . constitute on-campus speech" and the statements "shooting up the school this week" and "READY. [Student 1] AND MANY MORE WILL PERISH IN THIS STORM" constitute "terroristic threats. Id. (emphasis added). Finally, the committee found J.S.'s "Snapchat statements to constitute cyberbullying since they created a threatening environment which the High School Administration was compelled to investigate to ensure the

---

[5] The letters have different deadlines for notifying the School District if J.S. plans to attend the hearing and when the School District will provide names of its witnesses to J.S.

[6] The committee routinely uses the word "post" to refer to actions of J.S. when the record is clear that J.S. never posted anything on the internet or made public any of his memes.

6

safety of High School students and staff." Id. None of the charges relate to Student 2,[7] who was the student imaged in the memes, but relate solely to Student 1 with whom J.S. had been carrying on a Snapchat conversation over the prior ten (10) days.

The policies at issue are Manheim Township School District's Terroristic Threats policy and Bullying/Cyberbullying policy. The Terroristic Threats policy 218.2 states in relevant part:

### Purpose

The Board recognizes the danger that terroristic threats and acts by students present to the safety and welfare of district students, staff and community. The Board acknowledges the need for an immediate and effective response to a situation involving such a threat or act.

### Definitions

**Terroristic threat** – shall mean a threat to commit violence communicated with the intent to terrorize another; to cause evacuation of a building; or to cause serious public inconvenience, in reckless disregard of the risk of causing such terror or inconvenience.

Terroristic Act – shall mean an offense against property or an endangerment to another person.

### Authority

The Board prohibits any district student from communicating terroristic threats or communicating terroristic acts directed at any student, employee, Board member, community member[8] or school building.

RR 11 (citing 18 Pa.C.S.A. § 2706) (footnote added). The bullying/cyberbullying policy 249 states in relevant part:

---

[7] At oral argument the School District argued that the Terroristic Threats charge included Student 2, but the record does not support its assertion.

[8] The court makes no determination as to whether this policy is overbroad or exceeds the authority of the School District when it contemplates punishing students for out of school terroristic threats directed at a community member.

## Purpose

The Board is committed to providing a safe, positive learning environment for district students. The Board recognizes that bullying and unlawful harassment create an atmosphere of fear and intimidation, detract[] from the safe environment necessary for student learning, and may lead to more serious violence. Therefore, it shall be the policy of the school district to maintain an educational environment in which bullying and harassment in any form [are] not tolerated.

## Definitions

**Bullying** means an intentional electronic, written, verbal or physical act or series of acts:

1. Directed at another student or students;

2. Which occurs in a school setting;

3. That is severe, persistent or pervasive; and

4. That has the effect of doing any of the following:

   a. Substantially interfering with a student's education;

   b. Creating a threatening environment; or,

   c. Substantially disrupting or creating the reasonable apprehension of disruption of the orderly operation of the school[.]

**Bullying**, as defined in this policy, includes cyberbullying.

The terms **bullying** and harassment shall not be interpreted to infringe upon a student's right to engage in legally protected speech or conduct.

For purposes of this policy, **harassment** is any verbal, written, graphic, electronic or physical conduct relating to an actual or perceived, provoked characteristic including race, color, national origin, ethnicity, gender, age, disability, sexual orientation or religion when such conduct:

1. Is sufficiently secure, persistent or pervasive that it affects an individual's ability to participate in or benefit from an educational program or activity or creates an intimidating, threatening or abusive

8

educational environment.

2. Has the purpose or effect of substantially or unreasonably interfering with an individual's academic performance.

3. Otherwise adversely affects an individual's learning opportunities.

**School setting** means in the school, on school grounds, in school vehicles, at a designated bus stop or at any activity sponsored, supervised or sanctioned by the school (regardless of location) or conduct that is engaged in through the use of school-owned communications devices, networks or equipment.

The Board prohibits all forms of bullying by district students.

RR 17–18 (citing 4 P.S. § 13-1303.1-A).

Following the hearing, the committee recommended permanent expulsion of J.S. The school board ratified the committee's recommendation on May 10, 2018. On June 5, 2018, J.S. appealed his expulsion. He filed and withdrew a motion for supersedeas and filed a motion to supplement the record which this court denied.

## III.  STANDARD OF REVIEW

Pennsylvania local school boards have broad discretion in determining school disciplinary policy. Hamilton v. Unionville–Chadds Ford Sch. Dist., 714 A.2d 1012, 1014 (Pa. 1998).

> When one attacks the action of a school board concerning matters committed by law to its discretion, he [or she] has a heavy burden as the courts are not prone to disturb a school board's decision. Indeed, they are without jurisdiction to interfere therewith unless it is apparent that the school board's conduct is arbitrary, capricious and to the prejudice of public interest. Lack of wisdom or mistaken judgment is insufficient.

Commonwealth v. Hall, 455 A.2d 674, 676 (Pa. Super. 1983) (quoting Farris v. Swetts, 46 A.2d 504, 505 (Pa. Super. 1946); see also Giles ex rel. Giles v. Brookville Area Sch. Dist., 669 A.2d

9

1079, 1082 (Pa. Cmwlth. 1995). A court reviewing the actions of a school district is not to act as "a 'super' school board and substitute its own judgment for that of the school district." Hoke v. Elizabethtown Area Sch. Dist., 833 A.2d 304, 313 (Pa. Cmwlth. 2003). Therefore, "[i]n the absence of a gross abuse of discretion, the courts will not second-guess policies of the school board." Flynn-Scarcella v. Pocono Mountain Sch. Dist., 745 A.2d 117, 120 (Pa. Cmwlth. 2000); see also In re Appeal of J.A.D., 782 A.2d 1069, 1071 (Pa. Cmwlth. 2001).

However, "school districts do not have inherent power to implement any policy they deem fit in the name of school safety. A school district's rulemaking authority is limited to that which is expressly or by necessary implication granted by the General Assembly, regardless of how worthy the purported goal." Hoke v. Elizabethtown Sch. Dist., 833 A.2d at 310 (citing 22 Pa. Code § 12.3). When schools act outside their statutory authority, courts can intervene. Id. at 313.

The school board is deemed a local agency for purposes of judicial review. The record of the proceedings before the Manheim Township School Board are a full and complete record. The school board has certified the record. Accordingly:

> the court shall affirm the adjudication unless it shall find that the adjudication is in violation of the constitutional rights of the appellant, or is not in accordance with law, or that the provisions of Subchapter B of Chapter 5 (relating to practice and procedure of local agencies) have been violated in the proceedings before the agency, or that any finding of fact made by the agency and necessary to support its adjudication is not supported by substantial evidence. If the adjudication is not affirmed, the court may enter any order authorized by 42 Pa.C.S. § 706 (relating to disposition of appeals).

2 Pa.C.S.A. § 754.

10

## IV.   DISCUSSION

J.S. asserts that there is no substantial evidence supporting the school board's decision and therefore the analysis on appeal can be limited to whether J.S. received due process from Manheim Township School District. Because J.S. believes he did not receive due process, then it would follow that no first-amendment analysis is necessary. The School District disagrees and argues that the court must apply an analysis like the one used in Commonwealth v. Knox, 190 A.3d 1146 (Pa. 2018), as the First Amendment issues are bound up in the due process issues. The parties' differing views of even how the case should be analyzed demonstrate the lack of clear direction existing in case or statutory law. J.S. is not mounting a facial challenge to any statutes or school policies but asserts that Manheim Township has applied the school policies to him in an unconstitutional manner thereby depriving him of due process.

A school board's decision to punish a student can only be overruled if it is a violation of the student's constitutional rights, or is not in accordance with the law, or involved a violation of practice and procedure of local agencies, or if the board's findings of fact are not supported by substantial evidence. 2 Pa.C.S.A. § 754. J.S. focuses his appeal on assertions that (1) the school board did not make its decision in conformity with the law related to hearings before a local agency, and (2) even if the board did, its findings were not supported by substantial evidence. Manheim Township School District responds that the decision was not in violation of J.S.'s constitutional rights. In many ways the parties talk at cross-purposes; J.S. seeks to avoid a First Amendment analysis, and the School District presses the analysis. The court will examine each argument made by the parties, many of which overlap.

11

## A. Due Process Review of Local Agency Law

Public education in Pennsylvania is a fundamental right required by Article III, Section 14 of the Pennsylvania Constitution. See Sch. Dist. of Wilkinsburg v. Wilkinsburg Educ. Ass'n, 667 A.2d 5, 9 (Pa. 1995). The Fourteenth Amendment forbids a state to "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. Protected property interests "'are created and their dimensions are defined' by an independent source such as state statutes or rules entitling the citizen to certain benefits." Goss v. Lopez, 419 U.S. 565, 572–73 (1975) (quoting Bd. of Regents v. Roth, 408 U.S. 564, 577 (1972)). J.S. plainly has legitimate claims of entitlement to a public education based on state law, and these rights are protected from the state by the Fourteenth Amendment.

In making its decision to permanently expel J.S., the school board was obligated to follow the law relating to practice and procedure of local agencies and support its findings of fact with substantial evidence. J.S. argues that the school board did neither. First, he contends that the board relied on hearsay statements over the objections of his counsel to reach its conclusion. Second, J.S. believes the school board should have compelled the attendance of Student 1 at the hearing because J.S. requested him as a witness.

### 1. Hearsay Statements in Student Expulsion Hearings

It is evident from the record that the school board relied on many hearsay statements to render its adjudication and the attorney for the board concedes this is so. The attorney for J.S. objected on the basis of hearsay only twice. The first was an objection to an argument being made by Attorney Frankhouser in which he characterized what Student 1 would say had he been present for the hearing. RR 56. As part of her objection J.S.'s attorney objected "to any further

12

discussion about what the student would testify to when he is not present." Attorney Frankhouser represented that Student 1 would not be supportive of the position of J.S. and did not appear because Student 1 and his parents "are terrorized by the threats." Id. The second objection was to a question asked of Dean of Students, Matt Johns on redirect as to whether Student 1 viewed the meme as a joke. RR 94.

Though not extensive, the law is clear that when an attorney properly objects to uncorroborated hearsay testimony, a school board may not rely on that testimony as competent evidence. K.D. v. Midd-West Sch. Dist., 2009 WL 9097069, at *2 (Pa. Cmwlth. Jan. 30, 2009) (citing Walker v. Unemployment Comp. Bd. of Review, 367 A.2d 366 (Pa. Cmwlth. 1976)). There is nothing in the findings of fact clearly demonstrating that the school board relied on the hearsay statements objected to by the attorney for J.S., and his appeal cannot be sustained on this ground.

### 2. The Failure of the Board to Compel the Attendance of Student 1

J.S. also complains that the school board failed to compel the attendance of Student 1 at the expulsion hearing. "The law is well settled that the power of subpoena which formerly was exclusively a judicial power, may now be granted to nonjudicial bodies, commissions, agencies or officials *by statute, but the power and the extent of the power is to be determined in each case by the express statutory grant.*" Commonwealth ex rel. Margiotti v. Orsini, 81 A.2d 891, 893 (Pa. 1951). Subpoena power is statutorily granted to a school board in some circumstances. For example, when a school board considers terminating a professional employee, in effect terminating an employee's property interest, "The board shall have power to issue subpoenas requiring the attendance of witnesses at any hearing and shall do so at the request of the party

13

against whom a complaint is made." 24 P.S. § 11-1128. If a party refuses to appear after being subpoenaed, any party interested may petition the court of common pleas for a second petition issuing from the court. Id. If the party still refuses to appear, the court can hold the party in contempt. Id.

The legislature has also granted the Pennsylvania Department of Education subpoena power with respect to approval of construction or reconstruction of public school buildings, 24 P.S. § 7-731, and when determining "priority assigned to any project, or as to any other matter or determination affecting any applicant for Federal grants, appropriations, allocations and programs for the development of academic facilities." 24 P.S. § 26-2603-B.

J.S. points out his rights during a formal hearing outlined in § 12.8 of Title 22 of the Administrative Code. Under § 12.8, J.S. has the right to "testify and present witnesses on his own behalf." 22 Pa. Code § 12.8(b)(7). However, unlike Articles 7, 11, and 26, of the Public School Code, the legislature did not grant subpoena power to school boards in expulsion hearings governed by Article 13. A public school is a creature of the state and bound by the authority vested in it by the state. J.S.' reliance on Goss v. Lopez, while relevant later, does not stand for the principle that a government agency can engage in acts outside of its power.

The Department of Education has affirmatively created rights for students facing expulsion at a formal hearing. Those rights include the following:

> (5)     The student has the right to be presented with the names of witnesses against the student, and copies of the statements and affidavits of those witnesses.
> (6)     The student has the right to request that the witnesses appear in person and answer questions or be cross-examined.
> (7)     The student has the right to testify and present witnesses on his own behalf.

14

22 Pa. Code § 12.8. Relying on his right to cross-examine witnesses provided by § 12.8(b)(6), J.S. argues that implicit in the right to cross-examine is the requirement to subpoena. The context of the right to cross-examine shows that it is granted specifically regarding witnesses upon whose testimony, statements, and affidavits the School District relies to establish the offenses charged and justify the punishment of expulsion. Because the School District identified Student 1 as the only one whom it believed J.S. threatened and bullied, Student 1 is certainly a "witness against the student" as mentioned in sub-paragraph (5). "In almost every setting where important decisions turn on questions of fact, due process requires an opportunity to confront and cross-examine adverse witnesses." Goldberg v. Kelly, 397 U.S. 254, 269 (1970). "Welfare recipients must therefore be given an opportunity to confront and cross-examine the witnesses relied on by the department." 397 U.S. 270.

The School District is legally correct in its position that it has no authority to subpoena Student 1. Consequently, it indeed seems like J.S. has been given a right without a remedy—which courts have uniformly concluded is no real right at all. As the Pennsylvania Supreme Court observed in a different context:

> This lack of an efficient legal remedy is, in effect, the negation of a legal right. Not only is the maxim "ubi jus ibi remedium"—where there is a right there is a remedy—one of the proudest declarations of the common law, but it necessarily implies that a right without a remedy is not a right at all but a mere abstraction. It was said by Holt, C.J., in Ashby v. White, 2 Ld. Raym. 938, 953, that "it is a vain thing to imagine a right without a remedy; for want of right and want of remedy are reciprocal."

Willcox v. Penn Mut. Life Ins. Co., 55 A.2d 521, 530–31 (Pa. 1947).

All of this places the school board between a rock and a hard place. The school board has no ability to subpoena a witness who provides the only evidence against J.S. and whom J.S.

15

requested for his defense. The school board represented that it did all it could, "moving heaven and earth," to get Student 1 to appear. There is no reason to doubt the school board's representation, and without the power to compel, there is nothing more the school board could have done. It satisfied its obligation under the authority with which the legislature has vested it. Unfortunately, this effectively leaves J.S. with a right that has been negated.

Due process requires that J.S. have the right to compel the attendance of witnesses identified by the School District in its case against him. The failure of Student 1 to testify and be subject to cross-examination, through no fault of the school board, violated the constitutional rights of J.S. The right of J.S. to attend public school cannot be taken away from him without "fundamentally fair procedures to determine whether the misconduct has occurred." Goss, 419 U.S. at 574.[9] While Pennsylvania has created procedures that are facially fundamentally fair, the procedures lack a legal remedy for compelling a recalcitrant witness to appear at his hearing. "The Fourteenth Amendment, as now applied to the States, protects the citizen against the State itself and all of its creatures—Boards of Education not excepted." Id. (quoting W. Va. Bd. of Educ. v. Barnette, 319 U.S. 624, 637 (1943)).

The School District claims Student 1 was not a necessary witness to prove its case as threats and bullying depend on the intent of J.S. and not on the feelings of Student 1. This is true as far as it goes; however, the purpose of the hearing was also to "consider any disciplinary recommendation made by the Administration," and J.S. was aware this could include expulsion. Even accepting the school board's argument that whether Student 1 felt threatened or bullied is

---

[9] Appellant asserts that Goss stands for the proposition that cross-examination is required for an informal hearing. The court disagrees. The Goss court stopped short of such a conclusion.

16

irrelevant to proving a violation, which is inconsistent with Knox, J.S.'s request to question Student 1 was still essential to J.S.'s ability to argue against the recommendation of the Administration for permanent expulsion. Had Student 1 testified consistent with J.S.'s beliefs that their conversations were undertaken and understood in jest, J.S. would have had persuasive grounds to argue for a lesser punishment. Moreover, the school board's inability to require attendance of witnesses hamstrings its ability to comply with Knox.

As discussed below, Knox requires a contextual subjective analysis. No one knows how Student 1 would have testified because he refused to attend the hearing. Had Student 1 testified that he understood the memes as a joke, his testimony would have undermined the school district's entire case against J.S. If the school district would have still found that J.S. violated the terroristic threats policy without Student 1 feeling threatened by the meme(s), then there would have to be a causal link between J.S.'s directly messaging the meme to Student 1 and the resulting disruption. Any link would necessarily be weakened by Student 1's reposting the "threat" without the ability to claim compliance with a Safe2Say policy of reporting suspected threats. If Student 1 did not perceive the meme as a threat, and shared it publicly anyway, the school district would have a very hard time reconciling its decision to expel J.S. and not punish Student 1 at all.

## B. First Amendment Analytical Framework

J.S. also appeals the findings of fact as not being supported by substantial evidence. This issue on appeal is bound up with whether any violation of the First Amendment occurred in the board's decision. At a very basic level, it is unlikely that the framers of the United States Constitution and the Pennsylvania Constitution would have considered J.S.'s conduct to be

17

protected speech. See W. Pa. Socialist Workers 1982 Campaign v. Conn. Gen. Life Ins. Co., 485 A.2d 1, 6 (Pa. Super. 1984) ("In colonial Pennsylvania, the colonists were not at liberty to speak and write freely on governmental matters. Censorship, in the form of prior restraint as well as punishment, was the rule before adoption of the Constitution. Article 1, section 7 was adopted as a means by which to restrict the government's right of intrusion upon an individual's right of free speech. '[W]hat it was designed to do was to prohibit the imposition of prior restraints upon the communication of thoughts and opinions, leaving the utterer liable only for an abuse of the privilege.'" (emphasis added) (internal citations omitted) (quoting William Goldman Theatres, Inc. v. Dana, 173 A.2d 59, 62 (Pa. 1961)), aff'd, 515 A.2d 1331 (Pa. 1986).

The times we live in are no longer colonial, and the Supreme Court of Pennsylvania and the United States Supreme Court have deemed all sorts of conduct to be protected speech, from nude dancing, see Pap's A.M. v. City of Erie, 571 Pa. 375, 394 (Pa. 2002) ("[T]he nude dancing that is targeted for elimination by the Erie ordinance is expressive conduct that is subject to protection under Article I, § 7."), to the wear of clothing containing profanity, see Cohen v. California, 403 U.S. 15 (1971). With these broad parameters, there is little doubt that the conduct of J.S. is speech.

Regrettably, the prescient statement of Justice Wecht six months ago in Knox has come true. The majority's decision in Knox "offers no framework for a school district faced with the possibility of punishing (and possibly expelling) a student who has created a tasteless website or made derogatory and potentially threatening comments on social media." 190 A.3d at 1162 (Wecht, J., concurring and dissenting). Students "should not be subjected to . . . suspension . . . only to find out years later than [sic] their conduct was not prohibited by the First Amendment."

18

Id. Also informing the outcome of this appeal is the large body of case law developed as the progeny of Tinker v. Des Moines Independent Community School District, 393 U.S. 503 (1969).

The analysis used in the Tinker line of cases has two branches and at least one sub-issue relevant here. The two branches consist of first, whether the speech is such that it can suffer a blanket prohibition, essentially equivalent to a prior restraint and, second, whether the speech created or could reasonably create a substantial disruption in the school. An underlying additional issue is whether a public school has the right to regulate any speech occurring off of school property or outside of school events. All published cases on the issues of threats and bullying within the school context, analyze the speech under an ever developing rubric of student free-speech cases spawned by Tinker. Since Tinker, analysis of student speech rights has become more complex as a result of changing societal norms and technological advancement. The law struggles to keep up. When the Supreme Court authored Tinker in 1969, it had no idea that the analysis it used would one day be applied to instantaneous communication by devices in the hands of nearly every high school student in the country.

Pieces of an analytical framework are scattered about in various opinions, but no recent case has clearly set forth a way in which a school board, or reviewing court, is to evaluate a situation such as the one at hand. Chief Justice Cappy, writing for the majority in J.S. ex rel. H.S. v. Bethlehem Area School District, 807 A.2d 847 (Pa. 2002), has come the closest, though his rubric has been abrogated in part by Knox. Though abrogated as to the standard for determining whether a threat is true or not, it is still useful for its guidance on determining to what extent a school may control protected speech and for the framework it establishes.

19

In the spring of 1998, a student also with the initials of J.S., had created a publicly accessible web site containing derogatory, profane, offensive, and threatening statements directed towards one of the student's teachers and his principal. On the web site, the student created a page explaining why the teacher should die, asked to be given $20 to hire a hitman, and repeated 136 profanities aimed at the teacher. He culminated his rant with a drawing of the teacher showing her head cut off and blood dripping from her neck.

The student created his web site at home using his personal computer, but he told other students about the web site and showed it to another student at school. The principal of the school commented the effect of the web site caused the school to be at a low point worse than he had seen in forty years of teaching. The teacher suffered emotional distress and was unable to finish the school year. The school board eventually punished the student with a ten-day suspension and the district began expulsion hearings. The student appealed his discipline asserting that the school district did not meet its burden to establish a substantial disruption, as required by Tinker, and that the web site did not contain a true threat. Despite agreeing that the content on the student's web site did not constitute a true threat, the Pennsylvania Supreme Court upheld the school board's discipline of the student because the court believed the student's conduct had created a substantial disruption. 807 A.2d at 869.

In reaching its conclusion, the court first analyzed whether the student's web site was a true threat when the site: explained why the teacher should die, asked to be given $20 to hire a hitman, repeated 136 profanities aimed at the teacher, and showed a graphic drawing of the teacher with her head cut off and blood dripping from her neck. The court concluded this was

not a true threat. However, the court's analysis in J.S. v. Bethlehem is now problematic in light of Knox.

In Knox, the court was faced with a much different variation of speech and true threats in the criminal context. Jamal Knox and Rashee Beasley "wrote and recorded a rap song entitled, 'F–k the Police,' which was put on video with still photos of Knox and Beasley displayed in a montage. In the photos, the two are looking into the camera and motioning as if firing weapons." 190 A.3d at 1149. A third party uploaded the video to YouTube, and the link appeared on a public Facebook page entitled "Beaz Mooga," "which the trial evidence strongly suggested belonged to Beasley." Id.

In evaluating whether the contents of the video posed a true threat, the court in Knox highlighted the more threatening contents of the song, as well as quoting the full lyrics. Punctuated with background sounds of gunfire and police sirens, the song's lyrics "include violent imagery and numerous expletives," expressing hatred toward the Pittsburgh police. Id. The lyrics contain descriptions of killing police informants and police officers and refer to two law enforcement personnel, Officer Kosko and Detective Zeltner, by name. Id. The song suggests that Knox and Beasley "know when those officers' shifts end and that the crimes depicted in the song may occur in the officers' homes." Id. The lyrics also refer to a man who several years earlier had murdered three Pittsburgh police officers with weapons he had strapped to his body. Id.

Perhaps little attention would have been paid to the lyrics of Knox and Beasley, but they wrote the song and recorded the video while charges were pending against them as a result of their arrest by Officer Kosko and their identification by Detective Zeltner. During the arrest,

21

"police found fifteen stamp bags containing heroin and a large sum of cash on [Knox], as well as a loaded, stolen firearm on the driver's-side floor of the vehicle." Id. at 1148. Both Officer Kosko and Detective Zeltner, of the Pittsburgh Police Department, were scheduled to testify against Knox and Beasley in connection with the charges.

Another officer

> discovered the video while monitoring the "Beaz Mooga" Facebook page. He alerted other police personnel, including Officer Kosko and Detective Zeltner, who watched the video. Thereafter, Knox was again arrested and charged with, *inter alia*, two counts each of terroristic threats pursuant to Section 2706(a)(1) of the Crimes Code, and witness intimidation pursuant to Section 4952(a) of the Crimes Code.

Id. at 1150. The issue facing the court was whether the rap video "constitutes protected free speech or a true threat punishable by criminal sanction." Id. at 1152.

The majority held that the evidence against Knox was sufficient to support finding that he acted with subjective intent to terrorize or intimidate the police officers through the rap song. Accordingly, while the song may have been considered protected speech in another context, in the circumstances of the case against Knox, it was not protected speech. The majority further abrogated the objectively reasonable standard in J.S. v. Bethlehem for evaluating whether a threat is a true threat and not entitled to the protection of the First Amendment. Chief Justice Saylor explained: "an objective, reasonable-listener standard such as that used in J.S. is no longer viable for purposes of a criminal prosecution pursuant to a general anti-threat enactment." Id. at 1156–58.

In a lengthy concurring and dissenting opinion, Justice Wecht agreed that the majority properly explained the First Amendment principles in the true threat context and that the objective, reasonable-listener standard of J.S. v. Bethlehem was not viable. Further, he agreed

22

there is a requirement to assess the subjective intent of the speaker and that the facts demonstrate Jamal Knox intended to communicate a true threat via the lyrics of the rap song. Justice Wecht disagreed with the limited test adopted by the majority

Justice Wecht observed that the majority's test concludes two things: "(1) the First Amendment 'allows' states to criminalize speech when it is 'specifically intended' to terrorize or intimidate; and (2) 'evidentiary weight should be given to contextual circumstances' surrounding the statement." Id. at 1161. His disagreement lies in the refusal of the majority to answer whether the First Amendment *requires* proof of specific intent, or whether the Amendment would tolerate punishment of speech based upon proof of only a lesser *mens rea* such as recklessness or knowledge. The remainder of his dissent outlines the test he would propose. Yet the question remains unanswered, as Justice Wecht points out: what is the standard for evaluating a threat in a school context? Id. at 1162.

The Knox majority explained the deficiency of the J.S. v. Bethlehem objective reasonable-person standard of reviewing threats to determine if they are "true," and summarized the correct standard as follows:

> It seems to us that the seven members of the Black[10] Court whose views were represented by Justice O'Connor's plurality opinion and Justice Souter's responsive opinion believed the First Amendment necessitates an inquiry into the speaker's mental state. . . .
> . . . [T]he two facets of Black which are most relevant to this dispute are as follows. First, the Constitution allows states to criminalize threatening speech which is specifically intended to terrorize or intimidate. Second, in evaluating whether the speaker acted with an intent to terrorize

---

[10] In Virginia v. Black, 538 U.S. 343 (2003), the United States Supreme Court addressed the true-threat concept when it reviewed a Virginia statute which made it unlawful to burn a cross in public or on another's property with the intent to intimidate any person or group. The statute included a statutory presumption making the burning of a cross "prima facie evidence of an intent to intimidate a person or group of persons." Id. at 348 (quoting Va. Code Ann. § 18.2-423).

23

or intimidate, evidentiary weight should be given to contextual circumstances such as those referenced in Watts.[11]

Commonwealth v. Knox, 190 A.3d 1146, 1156–58 (Pa. 2018) (citations omitted) (footnotes added).

Returning to Chief Justice Cappy and the J.S. v. Bethlehem opinion, after the court determined that the web site the student created was not objectively a true threat, the court next examined whether the discipline the student received comported with student expression permitted by the First Amendment. In light of the case law as it existed in 2002, the court observed:

> What can be said, based upon these student expression cases, is that any constitutional analysis of a student's freedom of speech must include a number of considerations. First, a threshold issue regarding the "location" of the speech must be resolved to determine if the unique concerns regarding the school environment are even implicated, i.e., is it on campus speech or purely off-campus speech? . . .
> If it is determined that the speech is on-campus, other factors must be considered: the form of speech, (i.e., political, lewd, vulgar, offensive or other); the effect of the speech, (i.e., level of disruption); the setting in which

---

[11] As the Knox majority had earlier explained:

> The true-threat doctrine has its genesis in the Watts case. In that matter, Watts was attending a discussion group in Washington, D.C., during the Vietnam War when the military draft was in effect. After someone suggested young people become more educated before expressing their views, Watts responded:
>
> > They always holler at us to get an education. And now I have already received my draft classification as 1-A and I have got to report for my physical this Monday coming. I am not going. If they ever make me carry a rifle the first man I want to get in my sights is L.B.J.
>
> Watts was convicted under a federal statute making it a crime to threaten the President. The Supreme Court found the statute facially valid in light of the "overwhelming" interest in protecting the President's safety and allowing him to perform his duties unhampered by threats of violence. Nevertheless, the Court concluded that Watts' conviction could only be upheld if his words conveyed an actual threat as opposed to political hyperbole. Considering the full context of the statement – it was uttered during a political debate which often involves inexact and abusive language, the alleged threat was conditioned on an event Watts vowed would never occur (his induction into the military), and the audience reacted by laughing – the Court determined that the statement could only reasonably be interpreted as an expression of political dissent and not a true threat. Thus, the Court overturned Watts' conviction.

Commonwealth v. Knox, 190 A.3d at 1155 (citations omitted) (quoting Watts v. U.S., 394 U.S. 705, 706 (1969)).

the speech is communicated, (i.e., school assembly, classroom or other); and finally, whether the speech is part of a school sponsored expressive activity, (i.e., newspaper or play).

J.S. ex rel. H.S. v. Bethlehem Area Sch. Dist., 807 A.2d at 864 (citations omitted).

Distilling the above down to its essence results in a bifurcated analysis. Simply put, is the speech protected by the First Amendment, and if so, can it be prohibited consistent with the First Amendment? Putting it simply and applying it simply are wholly different things. The first question requires an examination of the uncertain nature of whether a true threat analysis is objective or subjective or a hybrid of each, as Justice Wecht proposes. The second question forces a look at Tinker and its progeny.

The court will begin with an analysis of the threshold question regarding the location of the speech and then analyze whether the memes are true threats under the Knox framework.

### C. Location of J.S.'s Speech and Nexus to the School

The court must first resolve what Justice Cappy in J.S. v. Bethlehem found to be "a threshold issue" regarding the location of the speech to determine if the unique concerns regarding the school environment are even implicated. 807 A.2d at 864. For example, the court must consider whether J.S.'s speech was on the school's campus or purely off-campus speech. See id. Due to the age of the internet, this threshold question is no longer a simple one. The challenge of this task is well summarized by Judge Jordan in Layshock ex rel. Layshock v. Hermitage School District, 650 F.3d 205, 220–22 (3d Cir. 2011), handed down the same day the Third Circuit decided J.S. v. Blue Mountain School District, 650 F.3d 915 (3rd Cir. 2011). Both opinions were authored after *en banc* review of issues similar to the ones facing this court.

25

In Layshok, Judge Jordan acknowledged that[12]

> whether Tinker applies "cannot turn solely on where the speaker was sitting when the speech was originally uttered[,]" because "[s]uch a standard would fail to accommodate the somewhat 'everywhere at once' nature of the internet[,]" . . . . For better or worse, wireless internet access, smart phones, tablet computers, social networking services like Facebook, and stream-of-consciousness communications via Twitter give an omnipresence to speech that makes any effort to trace First Amendment boundaries along the physical boundaries of a school campus a recipe for serious problems in our public schools.
>
> Tinker teaches that schools are not helpless to enforce the reasonable order necessary to accomplish their mission. Again, school officials may curtail speech if they can show "facts which might reasonably have led [them] to forecast substantial disruption of or material interference with school activities." We have similarly stressed that, "if a school can point to a well-founded expectation of disruption . . . the restriction may pass constitutional muster." Trying to limit that principle along real property lines is bound to run into trouble, as the J.S. concurrence concedes by saying that there can be difficulty in knowing whether speech has occurred on or off campus. That concession, though, fails to get at the fundamental difficulty in cases like these. The problem is not in knowing where a speaker was when uttering or otherwise creating speech. Like other historical facts, where a speaker said something is a matter that can be decided by typical fact-finding techniques. If the point of the J.S. concurrence is not to question where the speaker was physically so much as to question how to characterize the speech itself, i.e., as having on-campus or off-campus effects, then the definitional exercise only obscures the effort to answer the central dilemma, which is how to balance the need for order in our public schools with respect for free speech. That is the problem Tinker aimed to address and it is the problem we are confronting too, so we should be applying rather than avoiding Tinker.
>
> We cannot sidestep the central tension between good order and expressive rights by leaning on property lines. With the tools of modern technology, a student could, with malice aforethought, engineer egregiously disruptive events and, if the trouble-maker were savvy enough to tweet the organizing communications from his or her cellphone while standing one foot outside school property, the school administrators might succeed in heading off the actual disruption in the building but would be left powerless to discipline the student. Perhaps all of us participating in these en banc decisions would agree on that being problematic. It is, after all, a given that

---

[12] Judge Jordan's references to "J.S." are referring to J.S. v. Blue Mountain School District, a case which involved a student—another J.S.—who was subject to disciplinary action because she "said vulgar, offensive things about her principal on Myspace." 650 F.3d at 941.

"[t]he most stringent protection of free speech would not protect a man in falsely shouting fire in a theatre and causing a panic," and no one supposes that the rule would be different if the man were standing outside the theater, shouting in. Thus it is hard to see how words that may cause pandemonium in a public school would be protected by the First Amendment simply because technology now allows the timing and distribution of a shout to be controlled by someone beyond the campus boundary.

Layshock ex rel. Layshock v. Hermitage Sch. Dist., 650 F.3d 205, 220–22 (3d Cir. 2011) (citations omitted) (first quoting J.S. v. Blue Mountain Sch. Dist., 650 F.3d at 940; then quoting Tinker v. Des Moines Indep. Cmty. Sch. Dist., 393 U.S. at 514; then quoting Saxe v. State College Area Sch. Dist., 240 F.3d 200, 212 (3d Cir. 2001); and then quoting Schenck v. United States, 249 U.S. 47, 52 (1919)). Judge Jordan's comments are instructive in light of Knox as he writes that a student could use "the tools of modern technology . . . with malice aforethought." The intent of the student is an important consideration and consistent with the factors provided by the Knox court.

Moreover, just as "the Constitution allows states to criminalize threatening speech which is specifically intended to terrorize or intimidate," so also is a school board statutorily permitted to:

> adopt and enforce such reasonable rules and regulations as it may deem necessary and proper, regarding the . . . conduct and deportment of all pupils attending the public schools in the district, during such time as they are under the supervision of the board of school directors and teachers, including the time necessarily spent in coming to and returning from school.

24 P.S. § 5-510 (emphasis added). Clearly, a policy prohibiting terroristic threats is a reasonable rule which is necessary and proper, regarding the conduct and deportment of students within the Manheim Township School District. The statute enabling the School District to enact rules and regulations, however, is limited in application to the times students "are under the supervision of

27

the board of school directors and teachers." It is clear from this limit of the school's authority that conduct, speech, and activities of students not occurring at a time in which the student is under the supervision of the school cannot be regulated by the school. If it cannot be regulated, it seems that it cannot be punished either.

Even assuming that the memes constitute a true threat, none of the activity occurred "under the supervision of the board of school directors and teachers." Upon learning of the memes and realizing that none of the activity occurred or was occurring on school property, on the way to school, on school equipment, or at a school event, the School District's remedy was to report the conduct to the police, which they did.

The School District asserts that even though none of the activity involving the memes occurred on school property, at a school event, or through the use of school equipment, there is still a nexus to the school so that the School District can punish J.S. That nexus, according to the School District, is the statement in the meme "shoot up the school" and the fact that the school had to investigate the meme. This position is consistent with the one advocated in Judge Jordan's concurrence above in Lyshock. A student should not be permitted to yell "fire" into a school environment and escape any consequences from the school. Still, there must be limits on the authority of the school to pry into all student activity occurring away from school property and activities that the school believes may disrupt the school environment. Opening up all areas of student expression unmoored from a location consideration invites a school to supress legitimate matters of debate that could possibly affect a school environment and knocks out a support in Tinker of student free-speech rights.

28

Therein lies the rub. Perhaps the proximity standard articulated in Tinker and J.S. v. Bethlehem is not applicable to the category of speech that can be objectively interpreted as advocating violence towards a school or within a school. If the speech is of such a character, then in order to punish the speech, the school must show that the speech caused a substantial disruption or could reasonably be expected to cause such a disruption and engage in a true threat analysis. Carving out speech that objectively threatens school violence from a physical relationship to a school does not give absolute authority to the public school stretching to every minute of a student's life. It instead recognizes the realities of modern-day communications.

## D. Disruption and Threats of Student Violence

Morse v. Frederick, 551 U.S. 393, 424 (2007), raises the question of whether the Tinker substantial-disruption standard is even applicable to this case. With respect to this issue, the court finds Ponce v. Socorro Independent School District, 508 F.3d 765 (5th Cir. 2007), to be persuasive.

In Ponce, a high school student, E.P., kept a diary, written in first-person, in which a pseudo-Nazi group planned to commit a Columbine-style shooting attack at E.P.'s school. E.P. showed the diary to another student who then reported it. E.P. claimed that his diary was a work of fiction. After determining that the diary constituted a "terroristic threat," school officials suspended E.P. and recommended transferring him to an alternative education program. The Fifth Circuit found that school officials did not violate E.P.'s First Amendment rights, reasoning that if school officials could restrict student expression promoting illegal drug use, as decided in Morse, then they could certainly restrict student expression promoting school violence. "If school administrators are permitted to prohibit student speech that advocates illegal drugs . . .,

29

then it defies logical extrapolation to hold school administrators to a stricter standard with respect to speech that gravely and uniquely threatens violence." Id. at 771–72.

Judge Jolly's opinion in Ponce relied on Justice Alito's concurring opinion in Morse, quoting:

> [A]ny argument for altering the usual free speech rules in the public schools cannot rest on a theory of delegation but must instead be based on some special characteristic of the school setting. *The special characteristic that is relevant in this case is the threat to the physical safety of students.* School attendance can expose students to threats to their physical safety that they would not otherwise face. Outside of school, parents can attempt to protect their children in many ways and may take steps to monitor and exercise control over the persons with whom their children associate. Similarly, students, when not in school, may be able to avoid threatening individuals and situations. During school hours, however, parents are not present to provide protection and guidance, and students' movements and their ability to choose the persons with whom they spend time are severely restricted. Students may be compelled on a daily basis to spend time at close quarters with other students who may do them harm. *Experience shows that schools can be places of special danger.*

Ponce, 508 F.3d at 770 (quoting Morse v. Frederick, 551 U.S. at 424). According to the Fifth Circuit, Justice Alito's "concurring opinion . . . makes explicit that which remains latent in the majority opinion: speech advocating a harm that is demonstrably grave and that derives that gravity from the 'special danger' to the physical safety of students arising from the school environment is unprotected." Id. The Ponce court found that restricting student speech was appropriate on grounds of student safety, declaring it "untenable in the wake of Columbine and Jonesboro that any reasonable school official who came into possession of E.P.'s diary would not have taken some action based on its violent and disturbing content." Id. at 771 (quotation and alteration omitted).

30

Justice Alito's concurrence, highlighting student safety as an exception to the general prohibition of restrictions on free speech, is particularly illuminating since he also was the author of the majority opinion in Saxe v. State College Area School District, 240 F.3d 200 (3rd Cir. 2001). In Saxe then-Judge Alito undertook a thorough review of the Tinker substantial-disruption test, ultimately determining that the school district's policy on antiharassment was unconstitutionally overbroad because the school district was unable to show "a specific and significant fear of disruption, not just some remote apprehension of disturbance." Saxe, 240 F.3d at 211.

Like the court in Ponce, this court finds it untenable in the wake of Columbine, Jonesboro, Sandy Hook, and Lakeland that any reasonable school official who came into possession of J.S.'s memes would not have taken some action based on their disturbing content. That however is not the end of the inquiry. The court has determined that Tinker's location and disruption tests do not apply in this situation, but must now examine whether it was appropriate for the School District to punish J.S. in light of Knox, which was decided six months after the School District's adjudication.

### E. The School District's Terroristic Threats Policy and True Threats Analysis

The School District's terroristic threats policy defines a terroristic threat as:

> a threat to commit violence communicated with the intent to terrorize another; to cause evacuation of a building; or to cause serious public inconvenience, in reckless disregard of the risk of causing such terror or inconvenience.

Manheim Township School District Policy 218.2. RR 11. The only portion of this definition relevant to the School District's adjudication is whether J.S. communicated "a threat to commit violence" to Student 1 "with the intent to terrorize" him. The School District's adjudication

31

findings are slim on this issue and there is no finding or conclusion that J.S. acted in "reckless disregard[13] of the risk of causing such terror." The only findings by the School District are that the Snapchat statements which J.S. attributed to Student 3 in his memes regarding "shooting up the school this week," and "many more will perish in the storm" constitute terroristic threats. There is no specific finding by the board that J.S. communicated these memes with "an intent to terrorize" Student 1 or whether J.S. sent the memes in reckless disregard of whether they would terrorize Student 1. Moreover, there is no indication in the Adjudication to lead this court to believe that the School District used anything other than an objective approach in their threat determination.

A student can only be held responsible under the Manheim Township terroristic threats policy for a threat to commit violence when the threat is communicated with the intent to terrorize. Such true threats are not entitled to the protection of the First Amendment. The majority's opinion in Knox is the starting point for a true-threats analysis: "the Constitution allows states to criminalize threatening speech which is specifically intended to terrorize or intimidate," and "in evaluating whether the speaker acted with an intent to terrorize or intimidate, evidentiary weight should be given to contextual circumstances." Knox, 190 A.3d at 1158. While abrogating the objective test, the Knox court relied on J.S. v. Bethlehem for its contextual analysis. See id. at 1159 ("Pursuant to Watts and J.S., we also consider contextual factors in assessing whether the speech conveys a serious expression of an intent to inflict harm. These contextual factors include such items as whether the threat was conditional, whether it was

---

[13] It remains an open question as to whether reckless disregard is enough to sustain a charge against someone consistent with the First Amendment. See Knox, 190 A.3d at 1161.

communicated directly to the victim, whether the victim had reason to believe the speaker had a propensity to engage in violence, and how the listeners reacted to the speech." (citation omitted)). To summarize the contextual factors mentioned in Knox: (1) whether the statement was an "actual threat" versus "political hyperbole"; (2) whether the full context of the discussion was one that "often involves inexact and abusive language"; (3) "whether the threat was conditional"; (4) whether the threat "was communicated directly to the victim"; (5) "whether the victim had reason to believe the speaker had a propensity to engage in violence"; and, (6) how the victim reacted to the statement. Id. The school board did not engage in this analysis.

## 1. Actual Threat Versus Political Hyperbole

The Supreme Court in Watts noted that statutes criminalizing speech must be interpreted with due respect for this nation's "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wideopen, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." 394 U.S. at 708. The statement at issue in Watts—"If they ever make me carry a rifle the first man I want to get in my sights is L.B.J."—was spoken to a crowd during a public rally, and both the speaker and the crowd laughed after the statement. Id. at 706. Here, however, no one has suggested that the memes are political hyperbole. J.S. contends they are a bad joke between him and Student 1 about Student 2. The memes were transmitted in the course of a discussion between immature high school boys. While the subject matter was tangentially related to a politicized issue of guns and school violence, the dialogue between J.S. and Student 1 is not of the type considered political. The assertion by J.S. that his memes were a joke must be considered along with the other contextual factors below. Moreover, unlike in Watts where

33

the crowd's laughter in reaction to the statement showed that they did not interpret it as an actual threat, here the Dean of Students testified that on April 11, 2018, no one knew if a true threat really existed. RR 77.

### 2. Full Context of the Discussion

More akin to vulgarity than erudition, J.S. and Student 1 singled out Student 2 as someone they viewed as a possible school shooter. Their discussion occurred, not in an academic paper or professional debate but over a medium that easily eludes the eyes of parents and guardians: Snapchat. Messages on Snapchat "disappear" a very short time after being sent. RR 45.[14] The only way to save a message is to take affirmative steps to do so or take a screen shot (as another student did of the meme Student 1 posted to his Snapchat story).

As the context of a political speech was important to the United States Supreme Court in Watts, so too should be the context of the messages being sent between two teen boys on Snapchat in their own homes. While the subject matter was concerning, the medium was one that fosters inane communication. Also important to the context is the shirt worn by Student 2 in the memes, supporting a music group that writes lyrics celebrating cannibalism. RR 145.

### 3. Conditional and Communicated to Victim

The memes were not conditional in words, but they were conditional in person. J.S. was not threatening to shoot up the school or eat another student. J.S., in his meme, was stating that Student 2 was threatening to shoot up the school and that Student 2 was going to eat Student 1. There was no evidence presented to the school board that J.S. was intending to shoot up the school—or by implication, Student 1—or that J.S. intended to engage in cannibalism. There is

---

[14] See also supra note 3.

34

also no evidence that J.S. was using the memes of Student 2 as a proxy to threaten and bully Student 1. The communication between J.S. and Student 1 was conditioned on predicting what Student 2 would do; a prediction neither J.S. nor Student 1 could predict, but only badly joke about.

### 4. Victim's Belief of Speaker's Propensity to Engage in Violence

Student 1, who the School District states is the victim, did not testify at the hearing so it was impossible for the school board to determine his beliefs regarding the propensity of J.S. to engage in violence.

### 5. Victim's Reaction to Statement

Student 1 did not testify so the school board does not have any testimony to rely upon in evaluating his reaction other than what he did or did not do. Only twice did Student 1 do anything outside of his snaps with J.S. or publicly in reaction to the memes J.S. sent him. He posted two things to his Snapchat story: first a meme, then a statement. First, Student 1 posted one meme to his Snapchat story. After Student 1 told J.S. he put the meme up on his story, J.S. asked Student 1 to take it down, which Student 1 did after approximately 5 minutes. Student 1 then posted this statement: "Probable false alarm, just something J.S. sent me." The School District found that "the posting of [J.S.'s] threats by another High School student was consistent with the High School's request to let people know of threatening behavior." RR 44. Student 1 did not testify at the hearing and there is nothing in the record to support that Student 1's intent in posting the meme on his Snapchat story was to "see something and say something." This could certainly be justly claimed of Mr. Sassman's son, but not Student 1.

35

Student 1 did not receive the meme from J.S. and report it to the police, his parents, a teacher, a principal, a resource officer, a guidance counselor, or school administrator. The only testimony in the record is that Student 1 responded to the meme he eventually posted with "LOL" (laugh out loud). He did not tell J.S. to stop sending him messages via Snapchat. There is no evidence in the record showing that Student 1 did anything to express a fearful reaction to the memes J.S. sent to him, nor was there presented any competent testimony to the board regarding this factor. The only information before the board was an assertion made by the attorney for the School District, stating that Student 1 refused to appear because he was terrorized. This statement was objected to by counsel for J.S. and not supported by testimony or affidavit. It cannot be relied upon for a finding of fact.

Applying the Knox textual analysis results in a conclusion that the School District's decision was not supported by substantial evidence. There is not substantial evidence to support a finding that J.S. either intentionally or with reckless disregard threatened Student 1. The School District did not have testimony from Student 1, though J.S. timely requested his presence at the hearing. Through no fault of the School District, it was unable to produce Student 1 to testify. While the School District contends that Student 1's testimony is unnecessary to determine if a terroristic threat occurred, Knox instructs otherwise. In order to determine if the threat was a true one, the Knox court requires a contextual examination which includes at least two areas necessitating the testimony of Student 1, the victim. When the School District's adjudication in terroristic threats is examined through the lens of Knox, it must be found deficient and unsupported by substantial evidence. J.S.'s appeal of the School District's terroristic threats charge is sustained.

36

### F. The School District's Cyberbullying Policy

The School District also charged J.S. with cyberbullying Student 1 in violation of School

Board Policy 249 which defines bullying as:

> an intentional electronic, written, verbal or physical act or series of acts:
> 1. Directed at another student or students;
> 2. Which occurs in a school setting;
> 3. That is severe, persistent or pervasive; and
> 4. That has the effect of doing any of the following:
>    a. Substantially interfering with a student's education;
>    b. Creating a threatening environment; or,
>    c. Substantially disrupting or creating the reasonable apprehension of disruption of the orderly operation of the school
>
> **Bullying**, as defined in this policy, includes cyberbullying.

RR 18. According to the clear terms of the policy, the activity must occur in a

school setting which the policy explicitly defines:

> **School setting** means in the school, on school grounds, in school vehicles, at a designated bus stop or at any activity sponsored, supervised or sanctioned by the school (regardless of location) or conduct that is engaged in through the use of school-owned communications devices, networks or equipment.

The School District found the statements expressed in the memes created by J.S. were

cyberbullying because they "created a threatening environment which the High School

administration was compelled to investigate to ensure the safety of the High School students and

staff." RR 44.

The court has already determined that there is not substantial evidence to support a

finding that J.S. acted with the intent to terrorize or threaten Student 1. However, the School

District grounds its cyberbullying finding in the conclusion that J.S. created a threatening

environment and the high school needed to investigate. It is unnecessary for the court to

37

evaluate what the term "threatening environment"[15] means and whether an investigation is enough to support a cyberbullying charge, because there is not substantial evidence to support a more basic issue of the definitional requirement that the activity occur in a school setting.

Unlike the School District's sweeping Terroristic Threats policy which contemplates student punishment for any communication at any time directed to anyone in the community, the cyberbullying policy has clear and specific restrictions on where the communication must take place. In order for a communication to be cyberbullying it must occur "in a school setting." There is no need for the court to divine the meaning of "school setting" as it had to do with respect to terroristic threats, because the policy itself defines a school setting to be, "in the school, on school grounds, in school vehicles, at a designated bus stop or at any activity sponsored, supervised or sanctioned by the school (regardless of location) or conduct that is engaged in through the use of school-owned communications devices, networks or equipment." There is no evidence in the record that J.S. communicated any snaps or memes to Student 1 in the school, on school grounds, in a school vehicle, at a bus stop, at a school sponsored activity, or through using school equipment. Instead, the evidence suggests that all communication between J.S. and Student 1 occurred in their homes on their own time.

Substantial evidence does not support a finding that J.S. violated the School District's cyberbullying policy and his appeal of the finding against him is sustained.

---

[15] Appellant does not challenge the cyberbullying policy as being void for vagueness.

## V.    CONCLUSION

The School District was faced with a difficult and uncertain situation on the evening of April 10 and the morning of April 11, 2018. The school officials and administration acted admirably, placing the safety and interests of their students at the forefront of their actions. In their proceedings against J.S. after the event, however, they lacked the guidance of the Pennsylvania Supreme Court in <u>Knox</u> and they lacked the power to compel the attendance of witnesses required here for a <u>Knox</u> review. Because the School District lacked the ability to compel the attendance of a recalcitrant victim-witness, its adjudication of the terroristic threats charge, when examined under the requirements of <u>Knox</u>, is not supported by substantial evidence. Similarly, the Snapchat communication between J.S. and Student 1 did not occur in a school setting and consequently does not meet a required element for J.S. to be responsible for cyberbullying Student 1. J.S.'s appeal is sustained.

IN THE COURT OF COMMON PLEAS OF LANCASTER COUNTY, PENNSYLVANIA
CIVIL ACTION – LAW

J.S., a minor, by his parents,      :
M.S, and J.S.,      :
      Appellant,      :
      :
      v.      :  No. CI-18-04246
      :
MANHEIM TOWNSHIP SCHOOL      :
DISTRICT,      :
      Appellee.      :

## **ORDER**

AND NOW, this 25th day of February 2019, the appeal of J.S. is SUSTAINED and his

expulsion shall be EXPUNGED.

BY THE COURT:

LEONARD G. BROWN, III, JUDGE

ATTEST: C. Gerhart

Copies to: Lorrie McKinley, Esquire-counsel for Appellant *ESERVED*
    MAIL Nancy Ryan, Esquire-counsel for Appellant – 1
    Robert M. Frankhouser, Esquire-counsel for Appellee – 1

NOTICE OF ENTRY OF ORDER OR DECREE
PURSUANT TO PA. R.C.P. NO. 236
NOTIFICATION - THE ATTACHED DOCUMENT
HAS BEEN FILED IN THIS CASE
PROTHONOTARY OF LANCASTER CO., PA
DATE: 2-25-19

40